MEXICAN CENT. RY. CO., Limited, v. MURRAY.

(Circuit Court of Appeals, Fifth Circuit. May 8, 1900.)

No. 892.

1. TRIAL—INSTRUCTIONS TO JURY—DIRECTING VERDICT.

Where the court is in doubt as to whether a general charge to the jury to return a verdict for defendant upon the evidence should be given, the doubt should be resolved in favor of the submission of the case to the jury.

2. MASTER AND SERVANT—INJURY TO EMPLOYE—ASSUMPTION OF RISK—DEFECTIVE APPLIANCES—DIRECTING VERDICT.

While plaintiff was assisting in raising the span of a bridge, by hanging loops of track steel around the corner of the span, passing timber through the loops, and then elevating same by means of jackscrews, one of the loops broke, thereby causing a timber to fall against plaintiff, and throwing him from the cribbing, on which he was working a jackscrew, on to the ground below, and injuring him. Plaintiff knew the kind of material the loops were made of, and that they might break if too much strain was put upon them, and saw two of them break before the one by which he was injured, but the latter was defective, and this was not known to plaintiff. Held, that since in continuing to work after two of the loops broke, and when the third loop was strained, and he feared that would also break, plaintiff did not assume the risk incident to the use of the defective loop, the court properly refused to direct a verdict for defendant.

3. SAME—PROXIMATE CAUSE—ACT OF FELLOW SERVANT—INSTRUCTIONS TO JURY.

The evidence tended to show that when the loop in question broke the timber that struck plaintiff was pushed against him by the foreman in an attempt to save himself. Held that, the breaking of the loop being the proximate cause of the injury to plaintiff, the court properly refused to instruct the jury that, if they believed that the timber would have fallen without injury to plaintiff if it had not been pushed by the foreman, then the injury to plaintiff was caused by the act of a fellow servant, for which he could not recover of the employer.

4. SAME—INSTRUCTIONS TO JURY.

An instruction that unless plaintiff received his injuries from the natural and probable result of raising the end of the bridge, and by the means employed in raising same, he could not recover, was properly refused, since it eliminated the issue as to whether the appliances furnished by the employer were suitable, proper, and reasonably safe, and was calculated to mislead the jury.

5. SAME.

One of the issues in the case being whether the loop furnished by defendant was suitable and reasonably safe, the court properly refused to instruct the jury that plaintiff could not recover if he knew, or by the exercise of ordinary care might have known, that the work undertaken was dangerous.

In Error to the Circuit Court of the United States for the Western District of Texas.

This is an action brought to recover damages for personal injuries claimed to have been received by plaintiff below while he, as an employé of the railway company, with others, was engaged in raising the fallen end of a bridge. At the time of the accident one of the railway company's bridges was in course of repair. It seems that a flood had undermined an abutment on the bank of a stream, so that the abutment toppled out into the water, letting fall one end of one of the bridge spans. To return the span to its former position was the work in hand at the time Murray fell and was hurt. In order to elevate the span, a platform or cribwork was laid beneath the fallen end, the span was then slowly raised by means of large jackscrews

placed upon the platform, and the platform or "cribbing" itself was carried up with the span, as the work of elevating the same progressed. Murray fell, or, rather. was knocked, from the platform when the work had proceeded until the platform was about eight feet high. It being impracticable, in the opinion of those in charge of the work, to place the jackscrews immediately beneath the fallen end of the span, loops, made from track steel, were hung around or under each foot or corner of the fallen end of the span. Through the two loops pine timbers were passed until the loops were about the middle of the timbers. Then under each of the four ends of the timbers was set a jackscrew, screwed down as low as possible. As the jackscrews, thus standing upon the cribbing and beneath the timbers, were screwed up or extended by means of iron levers worked by gangs of four men to each screw, the bridge was raised. Like a weight or bucket is borne suspended from the middle of a pole, the end of the bridge span, suspended from the middle of the timbers by means of steel loops, was slowly raised to its former position by aid of the jackscrews. The cause of the accident was the breaking of one of the steel loops, generally called a "stirrup." Murray, who was working with one of the gangs on a lever at the time the loop broke, thought that either Foreman Robinson pushed the pine timber upon him, or that it naturally fell against him, when the loop broke and released it, and that he was thereby knocked from the platform. Defendant's witnesses claimed that Murray was straining at the lever at the time the loop broke. and that he therefore lost his balance and fell, as soon as the weight was taken off the jackscrew by the breaking of the loop. Whichever theory is correct, however, is unimportant; for it is certain that the breaking of the loop was the efficient cause of the accident. The bridge did not fall when the loop broke, as precautions had been taken to render this impossible, and nothing else happened that might not have been anticipated by one of ordinary intelligence.

The main issue in the case was, conceding the negligence of the railway company in furnishing a defective loop, did the plaintiff assume the risk of injuries from that source, and was the plaintiff guilty of such contributory negligence as would prevent a recovery? This was one of the defenses pleaded by defendant in its answer.

The plaintiff, Murray, testified: That he was engaged in raising one of defendant's iron bridges at the time he was hurt. That one of the abutments had been undermined by water. That said abutment fell halfway down, so as to leave it slanting at an angle of 45 deg., and the north span dropped down said inclining abutment so that the end of said span came 8 or 9 feet below the level of the track. That by means of a steel rail bent or made into loops, and placed one loop over each corner of the fallen end of said bridge, he and his co-laborers were attempting to elevate said bridge to its original position. That through each loop was slipped a pine beam 8 or 12 feet in length, and 12x12 inches thick. That said loops rested on the middle of said beams, and that under and near each end of said beams large jackscrews were placed. "I was helping to turn one of the jackscrews, and thereby assisting in raising the end of the bridge. As we would turn the jackscrews, the bridge would come slowly up. I helped put some of the stirrups on the foot of the bridge myself. I think there was about three broke. When one would break, they would go and get another, and put it on. and go ahead. I saw what kind of materials the stirrups (loops) were made of when they brought them there. I remember distinctly of two of these same kind of irons breaking before the one broke that injured me. I had been working there. and I had seen two or three of these stirrups broken before. I knew that they had been broken. I knew that they would break if too much weight were put upon them, and at the time I was turning the ratchet, or turning the jack,—that was just before the one broke that injured me,— I found it turning very hard. and I apprehended that the stirrup might break. I knew if it came much heavier it would be liable to break. I and Larry Fisher called Mr. Robinson's attention to it; said it was getting hard to pull and hard to turn. We both spoke about its getting very heavy to raise. We went ahead, and it was only a few turns—I don't remember just how long, but a very little while—until it broke. When the iron stirrup

broke, that took all the weight off the jackscrews, except the weight of the iron and the beam. When I fell I did not have hold of this lever at all. I was trying to keep the timber off of me,—this beam. When I fell it came against me. I put both hands against the timbers, and tried to shove it off of me, and it shoved me right off down below. It was supposed that Mr. Robinson was pushing against the opposite side of the timber to keep it off of himself. I heard him say so. When the iron broke, the end of the timber where the jack was working sprung up, and the timber was misplaced, and that end where we were working shoved me off of the platform, down about eight feet, down in the bed of the creek." "As to my familiarity with the work, as far as I went I knew how we had done the work. I saw them put this beam through the stirrup. I noticed when the weight of the bridge was on the beam it would spring about one-half of an inch down. I knew it would come back to its natural shape when the weight was suddenly removed. I knew it would spring up straight again. It (the beam) could have fell, or it could have been taken off easily. It could have been shaken off, and it could have been pushed off, by any one standing by, for there was nothing holding it. There was nothing holding it. No; it was just lying on top there. There was a block on top of the jack about four inches square that went against the beam,—an iron block. It was working on top of the jack, and was not fastened to the beam that it went under. There was generally a block put in between the beam and the iron block. I don't know about that for sure, but think there was. The blocks were different thicknesses, according to the height of the beam when we put the jackscrew in. It was sometimes thicker than at others. I think the height of the jack would be about four feet when fully extended. The base of the jack, I suppose, was about fourteen inches in diameter. The jack was not screwed down to the platform. It was always loose; just setting. The timber was sprung a little when the weight came on it. That is, when it was leaving the corner of the bridge. You could see it would spring down about one-half of an inch or five-eighths of an inch, and, of course, when it broke it seemed that it was the springing of the timber that upset the jacks. It could easily upset them. I could not say about what position it (the timber) came down, any more than that it upset the jack, and shoved me off. I saw all these things before I was hurt. If there was nothing to prevent, the beam would naturally tip over my way; if there was more of the beam over my side of the batter post than there was on the opposite side. After it passed the center, naturally the heavy part would tip down. As a carpenter, I knew more or less what this beam would weigh. I knew that if I fell off I might be hurt. To take the situation as it looked, the jack might fall off, and hurt anybody below it when it fell." "When the first shoe broke there were many employés working around there. None of them quit work on account of the breaking. I had no experience to tell me how much a railroad iron would lift. I never made a study of that thing, and never knew anything about it. I was under the immediate orders of Mr. Robinson. He was my foreman. When Mr. Robinson examined this, and told me that it was all right, I put reliance on what he said, and went on turning the jack."

Larry Fisher, among other things, testified that he examined the iron that broke which injured Murray immediately after the accident, and found a flaw in it which had been eaten away by the rust to the extent of three-eighths or one-half an inch on three sides, and that just before the accident occurred the jack at which they were working commenced to work hard, and that he was suspicious of something being wrong, and that he turned to the bridge foreman, Mr. Robinson, and told him that there was something wrong, and that the jack was working hard. Mr. Robinson examined it, and said, "No, there is nothing wrong; just keep right ahead;" and in less than three minutes from that time the stirrup broke, and the timber that was overhead struck Murray on the head, and caused him to fall into the river, and the jackscrew fell right across him. "I saw him fall, and he was badly hurt. The reason that we did not tell Mr. Robinson that we would not turn the jackscrew any more was because you are supposed to obey your foreman down there in that country when they give you orders." "I went ahead when told by Mr. Robinson, naturally supposing a man following the line of busi-

ness he was would not give instructions to the men working under him where he thought their lives would be in danger, and that he must understand his business. The iron that we were using to lift the bridge with was secondhand railroad iron. I noticed on the ball of the rail that it had been worn like as if it had been run over with car wheels. The flange had been worn out, and it was reported there that it had been picked up on the line. The flaw could have been detected before the break. The stirrup could have been hung up and tested with a hammer, and the ring would have told any mechanic or anybody familiar with iron whether it was a sound piece of steel or not. By the tone, it would have revealed the presence of the flaw. I would say that at least one-third of the iron had been affected by the rust. It had eaten in about three-eighths or one-half of an inch on three of the sides. The flaw was running in from the outer edge towards the center. The flaw ran right in from the opposite side of the ball from the flat of the rail. By hanging up this stirrup, and tapping it with a hammer, you can tell whether or not there is a flaw in it. This is a well-known test. The stirrup that I examined and found the flaw in is the one that injured the plaintiff."

G. J. Hartman, witness for the defendant, among other things testified that he was division superintendent on the division on which Murray was working, and was near the place of the accident when he was injured. "There was no danger whatever about the bridge falling, because we made all precautions for that. There was no danger about the bridge falling if any lifting apparatus should break, because we made all provisions for safety, and should the iron break there would ordinarily be no consequence attached to it. It would not make any material difference except to retard the progress of the work. There was no more danger to the men than there is in raising any kind of a heavy load. When a man is engaged in lifting heavy loads, there is always more or less danger. There was no more to indicate that Murray was in any special danger than any other man working there. There was nothing particularly to indicate that the angle iron would break. These irons may have been made of secondhand steel. I applied no test to them whatever. There was no test applied, to my knowledge. I did not know at that time what amount of weight this character of appliance was capable of sustaining. I sent no one to ascertain that fact by any means. The only way I could know what the thing would lift would be to put it to the actual test,—to the actual strain. I did not know when the first and second broke that the third was not capable of sustaining the end of the bridge. When we put the irons to the actual test, I knew, of my own knowledge, that three of them broke, and I think the third one that broke is the one that hurt Murray. I do not believe that I did inspect the hanger before it was put on to see if there was any defect in it."

A bill of exceptions, reciting all the evidence offered on the trial, shows the following proceedings:

"First. Under said proof defendant requested the court to charge the jury to find a verdict for defendant. The court refused to give said charge, as shown by statement subscribed to said bill of exception by the court, to wit: 'I have doubt as to whether this charge should be given, and, in view of such doubt, I decline to give it, and submit the case to the jury on the general charge of the court. [Signed] T. S. Maxey, Judge.' To the action of the court in refusing to give said charge defendant then and there excepted.

"Second. Under said proof defendant requested the court to charge the jury as follows: 'You are charged that if the danger to be expected from raising the end of said bridge in the manner and by the means employed was as open to the observation of plaintiff, Murray. as it was to the defendant or its servants in charge of said work, then plaintiff cannot recover, because in such case plaintiff, Murray, assumed the risk of such danger,'— which charge was by the court refused, and to the action of the court in refusing the same defendant then and there, in open court, excepted.

"Third. Under said proof defendant requested the court to charge the jury as follows: 'You are charged that if, in raising the end of the bridge in the manner and by the instrumentalities employed by plaintiff and his co-employés, there was no danger that could have been known by either plaintiff,

Murray, or the defendant or its servants in charge of the work of raising the end of said bridge, by the exercise of ordinary care, then plaintiff cannot recover in this case,'—which charge was by the court refused, and to the action of the court in refusing the same defendant then and there, in open court, excepted.

"Fourth. Under said proof defendant requested the court to charge the jury as follows: 'You are charged that if the danger that caused plaintiff's injury was as open and obvious to plaintiff as it was to defendant or its servants in charge of said work of raising the ends of said bridge, or if said danger was as well known to said plaintiff as it was to said defendant or its employés in charge of said work, then plaintiff cannot recover in this case,'—which charge was by the court refused, and to the action of the court in refusing the same defendant then and there, in open court, excepted.

"Fifth. Under said proof defendant requested the court to charge the jury as follows: 'You are charged that if you believe that when the iron stirrup broke, and the beam under which the jackscrew was placed, that plaintiff was engaged in turning, fell, that the same would have fallen without any injury to plaintiff if the same had not been pushed towards plaintiff by —— Robinson, a co-laborer, and that the pushing of said beam towards said plaintiff by said Robinson knocked him off of the platform and caused the injury to said plaintiff, then he cannot recover in this case, for said injuries to plaintiff would be caused by the act of a fellow servant, for which defendant is not liable in damages,'—which charge was by the court refused, and to the action of the court in refusing the same defendant then and there, in open court, excepted.

"Sixth. 'You are charged that it is only an injury that could be foreseen and reasonably anticipated as the natural and probable result of an act of negligence that can be recovered for. Therefore, if you believe from the evidence that the manner in which plaintiff received his injuries was not the natural and probable result of the raising the end of said bridge in the manner and by the means employed in raising the same, and that it could not have been foreseen and reasonably anticipated, that plaintiff in performing the work he was engaged in, in the manner in which he was performing the same, would have been injured in the way he was injured, then you will find for defendant,'—which charge was by the court refused, and to the action of the court in refusing the same defendant then and there, in open court, excepted.

"Seventh. 'You are charged that if it should appear that plaintiff knew that in performing the duty of raising the end of said bridge in the manner that he and his co-employés undertook to do so, or by the exercise of ordinary care might have known, that it was dangerous, and he (plaintiff) still continued performing said work, then, in that case, plaintiff cannot recover in this case. If there was danger to plaintiff in performing said work, and the danger was known to him or open to his observation, then it was his duty to refuse to perform the work, and thereby avoid the danger; and if he voluntarily continued to perform the work with the knowledge of the danger, or with the danger open and obvious to him, he cannot recover, for in continuing to perform the work under such circumstances he would assume the risk of such known or open and obvious danger,'—which charge was by the court refused, and to the action of the court in refusing the same defendant then and there, in open court, excepted."

Another bill of exceptions is as follows:

"Be it remembered that upon a trial of the above styled and numbered cause in said court, on the 5th day of October, A. D. 1899, came the plaintiff, and moved the court to strike out from the defendant's answer its exceptions and pleas to the jurisdiction of the court, because the same were not well taken, and were wholly untrue, and that same should not be considered by the court, and in support thereof plaintiff introduced defendant's original answer filed in this cause on the 4th day of October, 1898, and which is as follows:

"'Now comes the defendant in the above styled and numbered cause by its attorneys, and, excepting to plaintiff's original petition, says that the mat-

ter and things set forth and alleged therein are not sufficient in law to warrant a recovery thereupon, and of this the defendant prays the judgment of. the court.                                        Falvey & Davis, Attys. for Deft.

" 'And for further answer herein, defendant, by its attorneys, comes and says that it denies all and singular the allegations in plaintiff's original petition contained, and of this it puts itself upon the country.

" 'Falvey & Davis, Attys. for Defendant.'

—Which motion was then and there by the court duly sustained, and the court struck out all the exceptions and pleas of defendant to the jurisdiction of the court as in its answer set out.

"Defendant's exceptions and pleas to the jurisdiction of the court being as follows:

" 'That, excepting to plaintiff's original petition, defendant says that the matters and things set forth and alleged therein are not sufficient in law to show that the court has jurisdiction to grant the relief sought; wherefore the defendant prays the judgment of the court.

" 'Falvey & Davis, Attorneys for Defendant.

" 'And, for further special plea to the jurisdiction of said court, defendant, by its attorneys, comes and says that the laws of the republic of Mexico, as pleaded by plaintiff, are so vague and uncertain and dissimilar to the laws of this country that this court should not entertain jurisdiction herein and attempt to enforce said laws; that said laws have been passed upon by a decision of the supreme court of the state of Texas, to wit, in the case of Mexican National Railway Company v. James C. Jackson, it being therein held that the courts of this state would not sit to adjudicate controversies like the one at bar, under the laws of said republic of Mexico, on account of their dissimilarity to our laws; and that the policy of this state, and the courts of this country, would be not to interfere with the traffic of railroads, having their lines in Mexico, by adjudicating causes arising in Mexico.

" '(2) That said petition shows that the injury sustained by plaintiff occurred in the republic of Mexico, and any right of action he may have would be controlled by the laws of said republic. and it appears that said defendant has ever since said injury maintained its line of railroad in said republic, and continued to possess its property in said republic, and there is no reason shown in said petition why plaintiff did not sue for damages for said injuries in said republic, where the injury occurred, instead of bringing his suit in this court.

" '(3) That it appears from the laws of Mexico, as set out in plaintiff's petition, that if plaintiff has any cause of action it would be controlled by the laws of the republic of Mexico; that according to said laws, as set out in plaintiff's petition, that suit and adjudication of the rights of plaintiff, and the awarding of damages to the plaintiff for the injuries sustained, would not be a final determination of the rights between the parties, but that plaintiff, according to said law, would have the right to bring suits from time to time to recover in said suits, if said injury is continuing or permanent; that said law is contrary to public policy, and this court has no jurisdiction to enforce the same.

" '(4) That, according to article 313 of the Laws of said republic, the judge who takes cognizance of suits based upon civil responsibility shall endeavor to effect a compromise, so that the amount and terms of payment be fixed by agreement between the parties; that, according to said law, no right of action would accrue to the plaintiff after the judge who took cognizance of the case shall endeavor that the amount and terms of payment be fixed by agreement of the parties; that said law is contrary to public policy, and this court has no jurisdiction to enforce the same.

" '(5) That, according to the laws of said republic as set out in said petition, said plaintiff would have no right in a civil suit to recover damages for his said injuries, unless he shows that the acts of defendant which caused the injury constituted a crime under said laws of Mexico; that the recovery in such civil suit is penal in its nature; that this court cannot enforce the penal laws of the republic of Mexico; that said laws so pleaded do not so sufficiently define what acts are made penal under said laws as to enable this court to judge whether or not said acts by which such injury was caused

are penal, within the meaning of said law, to entitle plaintiff to any recovery in a civil action therefor.

" '(6) That, according to article 323 of the Laws of said republic of Mexico, a recovery may be had, not only for the damages sustained by the injury complained of, but the judge trying the case may award, as extraordinary indemnity, any sum that he may determine, considering the social position, etc., of the party injured; that said law is against natural justice and the policy of our law, in discriminating in favor of or against a litigant according to his social position, and this court has no jurisdiction to enforce the same.

" '(7) The laws of the republic of Mexico, by which plaintiff's cause of action will have to be tried, are so vague and indefinite that this court cannot properly and intelligently determine and administer the same; wherefore defendant prays judgment whether or not this court will take further cognizance hereof.                    Falvey & Davis, Attorneys for Defendant.

" 'Defendant, further pleading to the jurisdiction of the court, comes and says that plaintiff ought not to recover herein, because it says that the contract of service entered into by plaintiff and defendant herein was entered into in the republic of Mexico; that plaintiff's services thereunder were to be performed in said republic, where his wages and hire were to be paid; that plaintiff's cause of action, if any he has, arose entirely within said republic of Mexico, where defendant now and always has had and operated its railroad and business, and where all its cars and property are kept; it being at the time when plaintiff claims he was injured, and at all times since said date, subject to the jurisdiction of the courts of said republic of Mexico, under the laws of which it is entitled to have this cause adjudicated,—all of which defendant is ready to verify, and wherefore it prays the judgment of the court.            Falvey & Davis, Attorneys for Defendant.

" 'And, for further plea to the jurisdiction of the court in this behalf, defendant comes and says that actions and suits in said republic of Mexico are not regulated and governed by common law, but that all rights, remedies, and actions are entirely provided for and governed by the code and statutory laws of said republic, which materially alter and change the common-law rule; that, under the codes and statutes of said republic, plaintiff would not be entitled to recover for injuries sustained by him, as claimed in his petition, unless such act of defendant causing said injury is shown by plaintiff to be a crime under the penal code of the republic of Mexico; that no civil action would accrue to plaintiff in said republic for such an act of defendant as is set out in plaintiff's petition, unless such act was made penal by the laws of said republic; wherefore this court ought not to take cognizance of this suit, or attempt to enforce the penal laws of a foreign country, and wherefore the defendant prays that the court proceed no further herein, and that this case be dismissed.                Falvey & Davis, Attorneys for Defendant.'

"To the judgment and action of the court in granting plaintiff's motion, and in striking out said pleas and exceptions to the jurisdiction, defendant then and there, in open court, excepted, and now hereby tenders this bill of exceptions number 8, asking that same be by the court duly allowed, signed, sealed, filed, and enrolled and made a part of the record herein, which is accordingly done this 4th day of November, A. D. 1899.
                    "T. S. Maxey, Judge."

The trial resulted in a verdict and judgment for the plaintiff, and the railway company sued out this writ of error, assigning as errors the several adverse rulings of the trial court as set forth in the bills of exception.

T. A. Falvey and Waters Davis, for plaintiff in error.

Millard Patterson and C. N. Buckler, for defendant in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

After stating the case as above, the opinion of the court was delivered by PARDEE, Circuit Judge.

In refusing the general charge in favor of the defendant, the trial judge expressed his doubt as to whether the charge should be given,

but resolved that doubt in favor of the submission of the case to the jury. This was proper, and any doubts we have on the subject are resolved on the same side. It is clear that, as to the manner and method of the work in hand at the time Murray was injured, the danger and risk were as well known to him as to any other servant of the company there employed, either as superintendent, foreman, or ordinary laborer, and we are of opinion that, as to the apparent risks and dangers in carrying on the work, Murray assumed them with his employment. But the case shown requires us to go further. While Murray assumed the risks attending upon the operation, and knew there was danger, the question is presented whether, in assuming the known and apparent risks, he also assumed the risk resulting from unknown defects in the tools and appliances furnished by the railway company. The loop that broke—the breaking of which was the proximate cause of Murray's injury—was defective, and the negligence of the company in furnishing it is conceded. The defect, while it was more or less apparent, and was discoverable upon slight inspection, was not known to Murray, nor probably to any other employé of the railway company, at the time. There had been no inspection of the same. No effort had been made on the part of the railway company to ascertain whether the stirrup was or was not defective. Under the rules which govern in regard to appliances furnished by employers to employés, it must be held that in regard to this defective loop the railway company knew, or ought to have known, that it was defective.

This makes a case where, in regard to the risks and dangers attending upon the work, the employer knew more than the employés, and he did not communicate his information. Conceding that Murray assumed the known risks and dangers attending upon his work, did he also assume the additional risks and dangers resulting from defects in appliances which were unknown to him, but were known, or ought to have been known, to the railway company? If he did not assume these unknown risks, the general charge was properly refused. If it was a matter for determination from the evidence, and the evidence on the point was conflicting and uncertain, then there was no error in refusing the general charge. "It is well settled that, where there is uncertainty as to the existence of either negligence or contributory negligence, the question is not one of law but of fact, and to be settled by a jury; and this, whether the uncertainty arises from a conflict in the testimony, or because, the facts being undisputed, fair-minded men will honestly draw different conclusions from them. Railroad Co. v. Stout, 17 Wall. 657, 21 L. Ed. 745; Railroad Co. v. McDade, 135 U. S. 554, 10 Sup. Ct. 1044, 34 L. Ed. 235; Railroad Co. v. Converse, 139 U. S. 469, 11 Sup. Ct. 569, 35 L. Ed. 213." Railroad Co. v. Powers, 149 U. S. 43, 45, 13 Sup. Ct. 748, 37 L. Ed. 642. "The elementary rule is that it is the duty of the employer to furnish appliances free from defects discoverable by the exercise of ordinary care, and that the employé has a right to rely upon this duty being performed, and that, while in entering the employment he assumes the ordinary risks incident to the business, he does not assume the risk arising from the neglect of the employer to perform the positive duty owing to the employé with respect to appliances furnished. An excep-

tion to this general rule is well established which holds that where an employé receives for use a defective appliance, and with knowledge of the defect continues to use it without notice to the employer, he cannot recover for an injury resulting from the defective appliance thus voluntarily and negligently used. But no reason can be found for and no authority exists supporting the contention that an employé, either from his knowledge of the employer's methods of business, or from a failure to use ordinary care to ascertain such methods, subjects himself to the risks of appliances being furnished which contain defects that might have been discovered by reasonable inspection. The employer, on the one hand, may rely on the fact that his employé assumes the risks usually incident to the employment. The employé, on the other, has the right to rest on the assumption that appliances furnished are free from defects discoverable by proper inspection, and is not submitted to the danger of using appliances containing such defects because of his knowledge of the general methods adopted by the employer in carrying on his business, or because by ordinary care he might have known of the methods, and inferred therefrom that danger of unsafe appliances might arise. The employé is not compelled to pass judgment on the employer's methods of business, or to conclude as to their adequacy. He has a right to assume that the employer will use reasonable care to make the appliances safe, and to deal with those furnished relying on this fact, subject, of course, to the exception which we have already stated, by which, where an appliance is furnished an employé in which there exists a defect known to him or plainly observable by him, he cannot recover for an injury caused by such defective appliance, if, with the knowledge above stated, he negligently continues to use it. In assuming the risks of the particular service in which he engages, the employé may legally assume that the employer, by whatever rule he elects to conduct his business, will fulfill his legal duty by making reasonable efforts to furnish appliances reasonably safe for the purposes for which they are intended; and while this does not justify an employé in using an appliance which he knows to be defective, or relieve him from observing patent defects therein, it obviously does not compel him to know or investigate the employer's modes of business, under the penalty, if he does not do so, of taking the risk of the employer's fault in furnishing him unsafe appliances." Railroad Co. v. Archibald, 170 U. S. 665, 671–673, 18 Sup. Ct. 777, 42 L. Ed. 1188.

Now, Murray testified:

"I helped put some of the stirrups on the foot of the bridge myself. I think there was about three broke. When one would break, they would go and get another, and put it on, and go ahead. I saw what kind of materials the stirrups (loops) were made of when they brought them there. I remember distinctly of two of these same kind of irons breaking before the one broke that injured me. I had been working there, and I had seen two or three of these stirrups broken before. I knew that they had been broken. I knew that they would break if too much weight were put upon them, and at the time I was turning the ratchet, or turning the jack,—that was just before the one broke that injured me.—I found it turning very hard, and I apprehended that the stirrup might break."

Taking this in connection with the fact that the loop which broke and caused Murray's injuries was defective,—a fact which Murray

did not know,—it cannot be held, as a matter of law arising on undisputed evidence, that Murray, in continuing to work after two of the loops broke, assumed all the risk attendant upon the work because he continued to work when the third loop was strained, and he feared that also would break if the strain should be continued. The distinction is very narrow, but it clearly exists.

The second, third, and fourth charges requested were properly refused for the reasons just given in regard to the action of the court in refusing the general charge, and need no further notice.

The fifth charge requested, as follows:

"You are charged that if you believe that when the iron stirrup broke, and the beam under which the jackscrew was placed, that plaintiff was engaged in turning, fell, that the same would have fallen without any injury to plaintiff, if the same had not been pushed towards plaintiff by —— Robinson, a co-laborer, and that the pushing of said beam towards said plaintiff by said Robinson knocked him off of the platform, and caused the injury to said plaintiff, then he cannot recover in this case; for said injuries to plaintiff would be caused by the act of a fellow-servant, for which defendant is not liable in damages,"

—Was properly refused, because the proximate cause of the injury was the breaking of the stirrup, and any negligent action of a fellow servant taken at the time, particularly for the purpose of protecting himself, did not relieve the railway company from the responsibility of its own negligence.

The sixth charge was properly refused, because it is to the effect that, unless the plaintiff received his injuries from the natural and probable result of raising the end of the bridge, and by the means employed in raising the same, he cannot recover; and this eliminates entirely the issue as to whether the appliances furnished to raise the end of the bridge were suitable, proper, and reasonably safe, and, if otherwise correct in law, it would have tended to mislead the jury.

The seventh charge requested, that:

"If it should appear that plaintiff knew that in performing the duty of raising the end of said bridge in the manner that he and his co-employés undertook to do so, or by the exercise of ordinary care might have known that it was dangerous, and he (plaintiff) still continued performing said work, then, in that case, plaintiff cannot recover in this case. If there was danger to plaintiff in performing said work, and the danger was known to him or open to his observation, then it was his duty to refuse to perform the work, and thereby avoid the danger; and if he voluntarily continued to perform the work with the knowledge of the danger, or with the danger open and obvious to him, he cannot recover, for in continuing to perform the work under such circumstances he would assume the risk of such known or open and obvious danger,"

—Was correctly refused, for the reason just given as to the sixth requested charge.

All the questions raised as to the laws of Mexico and their applicability in this action have been heretofore determined adversely to the plaintiff in error, and need no further consideration. Evey v. Railway Co., 26 C. C. A. 407, 81 Fed. 295; Railway Co. v. Marshall, 34 C. C. A. 133, 91 Fed. 933.

The judgment of the circuit court is affirmed.