## MEXICAN CENT. RY. CO., Limited, v. ECKMAN.

(Circuit Court of Appeals, Fifth Circuit.    May 15, 1900.)

No. 893.

1. RAILROADS — NEGLIGENCE — DEFECTIVE TUNNEL — PERSONAL INJURY — EVIDENCE.

Plaintiff, who was conductor of a freight train on defendant's road, was injured by reason of his head striking against a rock in the roof of a tunnel, while riding on his train, seated on the top of the side of the cupola of the caboose. The evidence showed that the tunnel, at the point where plaintiff entered, was 18 feet from the top of the rail to the arch of the road, and that at 53 feet from the entrance it measured but 15 feet 10½ inches; that the standard clearance for tunnels is 20 feet, which is 19 feet and 7 or 8 inches above the top of the rail; and that it is customary to construct them so they will have a uniform section throughout, and not leave projections which will encroach upon the uniform section. It was also shown that some railroads use telltales or ropes hanging down near the approach to tunnels to warn men on top of a train, but that no warning was given at the entrance of defendant's tunnel. *Held*, that a request to instruct the jury for defendant, on the ground that the evidence failed to show that defendant was negligent in the construction of the tunnel, was properly refused.

2. SAME—CONTRIBUTORY NEGLIGENCE.

At the time of his injury, plaintiff was seated on the top of the side of the cupola of the caboose; having stationed himself there in order that he might see ahead, and that the engineer might see him. His train had already passed through two or three tunnels, and the one in which he was injured was of sufficient height at the entrance to clear him, but after proceeding therein about 50 feet his head struck against a rock in the roof of the tunnel, and he was knocked off, and run over by the train. Plaintiff had received no notice that the height of the tunnel was not uniform, and he had no knowledge that such was not the case. The evidence showed that plaintiff's position on the train was not improper, but that the custom is for men riding on top of a train to lie down when passing through a tunnel, and that it is the duty of a man in charge of a train to understand the condition of the road over which he runs. *Held*, that the question whether plaintiff was guilty of negligence contributing to his injury was properly submitted to the jury.

In Error to the Circuit Court of the United States for the Western District of Texas.

T. A. Falvey and Waters Davis, for plaintiff in error.

Millard Patterson and C. N. Buckler, for defendant in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

McCORMICK, Circuit Judge.    J. W. Eckman, the defendant in error, brought his action against the Mexican Central Railway Company, Limited, the plaintiff in error, to recover damages on account of injuries received by him while operating a work train in a tunnel on the railway company's road in the republic of Mexico. He was working on the San Luis Potosi Branch of the company's road, on a division in the Rascon Mountains between Cardenas and Tampico. He had commenced work as conductor of a work train on the 5th of August, and he received his injury on the 23d of August, 1898. On the day he was injured he had a train made up of two box cars, two flat cars, a caboose, and the engine.    The cars were being pushed

ahead of the engine, the engine facing in the direction that the train was moving, so that the engineer had the same in his eye. The injury occurred between 5 and 5:15 o'clock p. m. The sun had not gone down. The train was being pushed up the mountain side. The car farthest from the engine was a box car; next it was the caboose; next the caboose another box car, with the two flat cars between this last box car and the engine. The conductor was sitting on top of the side of the cupola of the caboose. There were about 200 Mexicans working on the track on this section of the road, and the conductor of this work train had orders to "get these men in" by 6 o'clock. There was a train due to leave Las Canoas, which it was necessary for the conductor of this work train to hold by flagging. The most reliable flagman he had had been sent forward on a passing train to Las Canoas to hold all trains until the work train got in. He had a man standing on the front end of the box car in front of the train, and stationed himself where he could see ahead, and where the engineer could see him. He also had two men standing between himself and the engineer. With his train, his men, and himself in the position just described he had, after sending forward his flagman, passed through two or three tunnels before entering this fourth tunnel, in which he received his injury. This fourth tunnel, in which the injury was received, is 225 feet in length. It has a sharp curve in it. He entered it from the east, and, after having proceeded about 50 feet, his head struck against a rock in the roof of the tunnel. He was knocked off thereby, and run over by a part of the train and by the engine, and badly hurt. The trial resulted in a verdict and judgment in his favor, to review which judgment this writ of error is brought.

Two errors are assigned, as follows:

"First. The court erred in refusing to give defendant's first special charge, where defendant asks the court to charge the jury to return a verdict for defendant (1) for the reason that the evidence introduced upon the trial of said cause failed to show that defendant was guilty of any negligence in and about the construction and maintenance of said tunnel, or the operation of its trains, or otherwise, which resulted in plaintiff's injury; (2) for the reason that the evidence showed that plaintiff himself, in riding on top of the cupola of his caboose, in the manner and under the circumstances in which he was riding at the time of his injuries, as shown by the evidence, was guilty of contributory negligence, which contributory negligence was the approximate cause of his injuries.

"Second. The court erred in sustaining plaintiff's motion, and striking out the pleas and exceptions of defendant to the jurisdiction of the court, (1) for the reason that said exceptions and pleas presented questions as to the jurisdiction of the court over the subject-matter in controversy in said cause, which questions of jurisdiction defendant would not and could not waive by pleading generally to the merits of said cause theretofore in its original petition; (2) for the reason that the right or liability of a corporation to sue or be sued in this state depends upon the sanction of the laws thereof, and that it is the policy of our state, as announced in the decision of Railway Co. v. Jackson (Tex. Sup.) 33 S. W. 857, to exclude from our courts controversies arising or accruing in the republic of Mexico under the laws of said republic, where no reasons are given for the institution of suits in our courts, and so that the traffic of railroads having their lines in Mexico may not be interfered with by the adjudication of causes of action arising in Mexico; (3) for the reason that the laws of the republic of Mexico which are applicable to plaintiff's suit, and which regulate the rights and remedies of

the parties; are so dissimilar to our laws that it is against the policy of this state and the courts of this country to attempt the enforcement thereof; (4) for the reason that the injuries sustained by plaintiff occurred in the republic of Mexico, and that any right of action he may have would be controlled by the laws of said republic, and it was charged that defendant ever since plaintiff's injuries maintained its line of railroad in said republic, and continued to possess its property therein; (5) for the reason that according to the laws of said republic the suit, and adjudication of the rights of plaintiff, and the awarding of damages to the plaintiff for the injuries sustained, would not be a final determination of the rights between the parties, but that plaintiff, according to said law, would have the right to bring suit from time to time, and recover thereon, where said injury is continued or permanent, as claimed in this case, which law is contrary to public policy, and should not be enforced by the courts of this state; (6) that according to said law the judge who takes cognizance of suits based upon civil responsibility is required to attempt to effect a compromise between the parties, which attempt must precede the bringing of a suit, plaintiff's right of action not accruing until after such judge should attempt to compromise such cases, which law is contrary to the policy of this state, and should not be enforced by our courts; (7) for the reason that plaintiff, under said laws, could not recover of defendant without showing that the acts resulting in his injury constituted a crime under the laws of Mexico, and that the recovery in a civil suit is penal in its nature, and that said laws pleaded by plaintiff do not sufficiently define the acts that are made penal so as to enable the court and jury to determine the rights and liabilities of the parties therefrom, wherefore our courts should not attempt to enforce the same; (8) for the reason that said laws give damages commensurate with the social position of the party injured, and therein are contrary to natural justice and the policy of our state, which laws this court has no jurisdiction to enforce; (9) for the reason that the contract of service entered into between plaintiff and defendant was made in the republic of Mexico, and that plaintiff's services therein were to be performed in said republic, where his wages and hire were to be paid, and plaintiff's cause of action arose entirely within said republic, where defendant now and always has had and operated its railroad and business, and where its cars and property are kept,—defendant being at the time when plaintiff claims he was injured, and at all times since said date, subject to the jurisdiction of the courts of said republic of Mexico, under the laws of which defendant is entitled to have its cause adjudicated; (10) for the reason that actions and suits in the republic of Mexico are not regulated and governed by the common law, but that all rights, remedies, and actions are entirely provided for and governed by the codes and statutory laws of said republic, which codes and laws materially alter and change the common-law rule."

All the questions raised by the second assignment of error were presented in substantially the same manner on the trial in the circuit court, and on a writ of error before this court, in the case of Mexican Cent. Ry. Co. v. Murray (recently decided) 102 Fed. 264, and in which case, in reference to these questions, we said: "All the questions raised as to the laws in Mexico and their applicability in this action have been heretofore determined adversely to the plaintiff in error, and need no further consideration,"—citing Evey v. Railway Co., 26 C. C. A. 407, 81 Fed. 295; Railway Co. v. Marshall, 34 C. C. A. 133, 91 Fed. 933. This second assignment of error will therefore receive no further consideration.

The first assignment of error presents the issue as to whether there was any evidence tending to show negligence upon the part of the plaintiff in error in the construction and maintenance of the tunnel in which the defendant in error received his injury; and, further, whether the evidence showed that the defendant in error by his neg-

ligence so contributed to the injury as to forbid the submission of this issue to the jury. The plaintiff's own testimony tended to show that tunnel No. 4 at the entrance where the defendant in error entered was 18 feet from the top of the rail to the arch of the road, and amply sufficient to clear him in the position he occupied on the caboose; that a little further in it was 16 feet 10 inches, still a little further in 17 feet 1 inch, and at another place 17 feet 8 inches, and then 16 feet 3 inches; that this last-mentioned one was 30 feet inside of the tunnel from the east entrance; that at 53 feet from that entrance it measured 15 feet 10½ inches from the rail next the mountain side to the roof of the tunnel, and 16 feet 1 inch from the rail on the other side; that this ledge extended across the track from one side of the tunnel to the other, and was the lowest point found by the witnesses who measured the tunnel and testified on the trial. The witness Wellington, who assisted in the measurement of the tunnel, said that he commenced his measurement at the end the plaintiff (below) went into:

"We measured close to the end, or at the entrance. We started at the east end. The first measurement was 19 feet 6 inches. The next was 18 feet 7 inches. This was taken about 3 or 4 feet along the rail, from the rail to the roof of the tunnel. I took the lowest places I could see to measure from. The next one was 17 feet 10 inches; the next was 17 feet 6 inches; the next 17 feet 4 inches; the next 18 feet 4 inches; the next 17 feet 1 inch; the next 18 feet 3 inches; the next 16 feet 6 inches; the next 16 feet 1 inch; the next 16 feet 5 inches; the next 19 feet 1 inch; 20 feet 4 inches; 17 feet 1 inch; 19 feet 1 inch; 17 feet 10 inches; 18 feet 7 inches. When I got to 19 feet, I concluded I had measured far enough. I knew from what he said that we were further in than where he was knocked off. I went to the end of the tunnel towards San Luis Potosi, and I commenced measuring there. The first place we went was 17 feet 10 inches; then 18 feet 6 inches; then 18 feet 7 inches; then 18 feet 6 inches; 18 feet 8 inches; 18 feet 9 inches. Then I concluded to go to the east end of the tunnel, and measure on the other side of the track, on the outside of the curve, towards the mountain. The other measurements were on the inside. The first measurement on the outside of the curve was 17 feet 11½ inches. That is at the entrance of the outside rail. The next was 16 feet 10 inches; then 17 feet 1 inch; then 17 feet 8 inches; then 16 feet 7 inches; then 16 feet 6 inches; then 17 feet 4 inches; then 15 feet 10½ inches. From the entrance of the tunnel where plaintiff went in to this last measurement was about 53 feet. This was the lowest point where the tunnel roof came down to 15 feet 10½ inches from the rail. The roof was very rough. I measured every 3 or 4 feet. It is all solid rock. Some of the rocks came closer down to the rail than others. I measured from the top of the rail. When I came to this rock, 15 feet 10½ inches, that was not anything more than a rock simply projecting down towards the railroad track."

The witness Hartman, the superintendent on the Chihuahua Division of the company's road, testified for the company in part as follows:

"The rules of railroad companies require the trainmen to be on top of the train approaching stations and passing stations, and at no other time. If an engine was backing some cars up a mountain, it would be the conductor's duty to be on the first car; that is, the one furthest from the engine, on top of the car. If the engine was pushing the train, it would be the first car in front. It would be his duty in pushing these cars to be where he could see the track and signal the engineer. If the track was so curved that from the front end he could not see the engineer, it would be proper for him to be nearer the engine, where he could see and give his sig-

nals, provided he had a man on the front end. If the conductor should deem it necessary for him to be near the middle of the train to keep a better lookout, and he had a man on the front end of the train, it would not be improper for the conductor to be there, but there is no rule compelling him to be at such place. There is no rule of the company on it. If in his judgment it is proper for him to be there, and he thought it necessary, in the discharge of his duty as conductor, to take that position, towards the middle of the train, he would not be out of his place. He did not violate any rule of the company. I never knew of a man riding on a train going through a tunnel either standing or sitting up. They lie down; lie down flat. That is what it is proper for them to do. They do it on all roads that I ever knew anything about. They could see nothing going through a tunnel, no matter what position they occupy. I know of no rule that says anything about a man being on top of a train going through a tunnel, either lying down or otherwise. I have filled the positions of track laborer, freight rustler, telegraph operator, cashier, ticket clerk, roadmaster, trainmaster, brakeman, conductor, and superintendent. I have never done any braking where there were tunnels, but have where there were low bridges. If the bridge was not high enough to clear me, I should lie down. The man in charge of a train is supposed to understand the condition of the road over which he runs; otherwise he is not fit to take charge of the train. I do not say that a man passing through a tunnel a few times on a moving train can look up and tell the distance from the railroad track to the roof of the tunnel. If I was a conductor or brakeman on the train, I would know where the tunnel was. It is not the custom of railroad employés to stop the trains and measure these tunnels and bridges. It is not their business or duty to do it. A man on a train passing through a tunnel could not estimate the height of a tunnel. He could only guess at it."

The witness Kruttschnitt testified for the defendant, among other things:

"I have stated that the present standard clearance is 20 feet above the tie, which would be 19 feet 7 or 8 inches above the top of the rail. As the highest box cars hauled are 13 feet 10 inches in height from the top of the rail to running board, there would be headroom in these tunnels for a man standing erect on the running board 5 feet 9 inches or 10 inches, and correspondingly less in tunnels with 16 or 18 feet clearance. * * * In tunnels driven through solid rock formation, which requires no lining, it is customary to prescribe a minimum height and width inside, which allows no projection. This minimum height and width depends upon the established practice of the road, and in blasting some part of the tunnel might very well be a foot or more higher than others."

The witness Mudge, who testified by deposition for the railway company, concludes his testimony thus:

"It is the practice to maintain the same height throughout tunnels which are entirely in rock sections. But this is not uniform, as sometimes the falling of stones makes it necessary to make them larger than the standard dimensions of the tunnel."

The witness Dickenson, who testified by deposition for the company, says, among other things:

"Tunnels are usually and customarily so constructed as to have uniform section throughout. It is not customary to leave projections which would encroach upon the uniform section."

The witness Bryan, testifying for the defendant, said:

"It is not the practice to smooth the roof and sides of tunnels in the United States so that no stone may project from its roof or side, but it is the practice not to have stones project at the sides and roof inside the specified dimensions of the tunnel. In other words, if a tunnel is constructed of a certain width and height, the roof to conform to an arch turned to a certain radius

located a certain distance above the grade of the tunnel, it is the practice to remove any fragments of rock that project inside the section of the tunnel; but it is impossible to prevent the rock from breaking outside the section of the tunnel, thereby making the tunnel in places of considerably larger size than the prescribed dimensions. Under these conditions, it is impossible to prevent tunnels being higher or wider at certain points than at certain other points in their extent."

### The witness Hartman, before referred to, testified that:

"Telltales are not used at bridges and tunnels on all well-regulated railroads. They frequently use them, but it is not usually done. * * * I have none of the train sheets of the Mexican Central showing the prescribed dimensions of their tunnels. There are blue prints showing the dimensions of the tunnels. I could not procure one before the trial is over. I could procure one from the chief engineer of the road, who has them at the City of Mexico. I could not get one short of the City of Mexico. I would not have time to get it here for the trial. I do not know anything about this tunnel in question. I have been through it twice, but never measured it. I think the measurements of the railway company are here. They had this tunnel measured. I think the attorneys for the defendant have the measurements. However, I am not certain. I do not know the number of the caboose on which Mr. Eckman was riding when he was injured. The standard height of a caboose on the Mexican Central is about 11 feet 4 to 6 inches from the top of the rail to the top of the cupola, and the cupola is 2 feet 6 inches from the top of the roof to the top of the cupola in the center; not quite so high on the edge of the cupola as it is round. The measurements will vary according to whether a car is loaded or not. The cupola of the car right would be about 14 feet, 1, 2, 3, 4, or 5 inches from the top of the rail to the top of the cupola. If the springs of the car are weak, and there is a load in the car, it will not be quite so high."

### At another place he says:

"Sometimes they have telltales or ropes hanging down near the bridges, and those sort of things, at a tunnel, and sometimes they do not have them. The object of having telltales is to warn a man on top of a train that he is approaching a bridge or tunnel that will not clear him. A telltale is where two poles are put up, one on each side of the railroad track, similar to a telegraph pole, and they are planted to run up to a certain height, and then there is a rope tied across, with smaller ropes hanging perpendicularly about 6 or 8 inches below, and they will come down so that, if a man is standing on top of a car, he will strike these telltales or ropes, and warn him he is approaching a tunnel or low bridge."

No such warning was given at the entrance or near the entrance of the tunnel in which the defendant in error received his injury. He had received no notice from any one that the tunnel did not carry a height throughout its length uniform with the height at its entrance, and he had no knowledge himself that such was not the case.

In the case of Hunter v. Railroad Co. (N. Y. App.) 23 N. E. 9, 6 L. R. A. 246, it is said in the opening of the opinion:

"Assuming that the plaintiff was struck upon the head by the brick arch within the tunnel, and that he was, as a result of that blow, thrown from the cars and injured, I think there was ample evidence for the jury to determine that the defendant was guilty of neglect producing the accident, and that the plaintiff was free from carelessness contributing to it. The jury were warranted in finding that the only notice that the plaintiff had of the existence of the arch was that received from the telltale. This was located about 200 feet west of the west entrance of the tunnel. It served as a warning of the approach to the tunnel, but it gave no notice of the obstruction within the tunnel. A person receiving its warning, and noticing the height of the tunnel, might naturally suppose that the height at the entrance would

be maintained throughout its length, and, if the height was at any time reduced, that notice of that fact would be given. Relying, therefore, upon what would be apparent to his observation, he was exposed to a danger of which he had no notice or information."

There is much other testimony bearing on the issues presented by the first assignment of error, but we believe that the evidence we have recited is ample to show that the trial judge did not err in refusing to give the requested special charge referred to in this assignment. The issues were submitted to the jury under proper and sound instructions, to which the plaintiff in error did not and could not take any exception. The judgment of the circuit court is affirmed.